All rise. The United States Court of Appeal for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning ladies and gentlemen. Seems to be quite a few people interested in platelet aggregation. Maybe it's stereochemistry. We have one case this morning. Sanofi-Synthelabo and Bristol Myers Squibb v. Apotex 06-16-13. This came to us on a motion for a stay of a preliminary injunction. We denied the preliminary injunction and set the case for expedited briefing and oral argument on the merits of the grant of the preliminary injunction, which is where we are now. So we will hear from Mr. Chasen. Good morning. Bruce Chasen from Caesar Rivers for Apotex. Plavix, which is clopidogrel bisulfate, is a pharmaceutical that is covered by Claims 1 and Claim 2 of the Sanofi's expired 596 patent. The 265 patent improperly extended Sanofi's patent monopoly. The injunction rendered by the district court in this case was wrongly entered because the 265 patent is vulnerable on multiple grounds, including anticipation, double patenting, obviousness, incorrect inventorship, and inequitable conduct. Other than that, the patent is all right. I will limit my argument this morning to the issues of anticipation, double patenting, and irreparable harm. If I have time, I may come back to obviousness. And I will rely on the briefs for the other issues unless the court has questions. And at the end of the day, we ask the court to revisit Apotex's motion to stay the injunction and to grant a stay. Now, with respect to anticipation, the district court made a— You want us to grant a stay and also, of course, to reverse the preliminary injunction. Absolutely. So we're here with respect to the latter question, but ancillary to that, you want to stay pending, I take it, our resolution of the ultimate question. We wouldn't like that. All right. Just to be clear. All right. Yes. The district court error on anticipation was focusing on the genus of Claim 1 of the 596 patent. The district court never discussed Claim 2 in the patent and only made passing reference to Derivative 1 in the specification. The district court also never discussed the appropriate precedents, which are in re shaman and in re may. It also failed to cite and apply purpose-specific disclosures in the 596 patent. Did you clearly present your Claim 2 argument to the district court? Yes, we did. And where on the record did we see you presenting that? It was in the testimony of Dr. McClellan. It was in the brief in opposition to the motion to preliminary injunction. It was in Apotex's opposition to the pretrial brief that Sanofi filed. It was in several places, Your Honor. We didn't have, in terms of your response to the pretrial memorandum, we only had excerpts, so I was unable to see the argument. That's correct. I think under the rules we're not allowed to put the whole brief in. But Claim 2. The pertinent part would have been your Claim 2 argument. Move on. Claim 2. We did put in, Your Honor, our claim construction brief. We moved for claim construction on the 596 patent in support of our double patenting arguments. Yeah, that's in A6302. I saw that. Yeah, that brief is in there on the claim construction. It's in the appendix. Claim 2 of the 596 patent is that methyl alpha compound that we referred to as MACPCA for shorthand. And the specification of the 596 patent states that the invention relates both to each enantiomer or their mixture. It also states that the invention also includes addition salts with pharmaceutically acceptable mineral or organic acids. But your point about Claim 2 is a petering point, isn't it? Yes. That it is a narrow genus which encompasses the compounded issue, which is Claim 3 of the patent asserted against you. But Claim 2 is not generic to the salts. Well, we believe it is, Your Honor, because the specification says the invention also includes addition salts. But claims define the invention. I agree. Claim 1 includes salts. If Claim 2 had been dependent and said a compound of Claim 1 consisting of, then arguably salts would have been included. But Claim 2 is specific to the free base. No, we don't think so, Your Honor. We agree that Claim 2 is not dependent. But the way Claim 2 should be interpreted is according to the specification. And the specification expressly says the invention includes enantiomers or their mixture. It includes acid addition salts. In other words, you can include all sorts of variations from the specification to interpret a claim. You can include acid addition salts because that's what the inventors wrote. They wrote very specifically, invention also includes addition salts with pharmaceutically acceptable mineral or organic acids. And as a practical matter, anybody who's skilled in the art would know that you have to introduce this drug into the body as a salt, as an oral medication. So in any event, our view is that a person of ordinary skill in the art interprets Claim 2 in light of the specification. Now, there are 21 derivatives in the specification that are racemates. But the specification is clear that the examples are non-limiting examples. To read Claim 2 as limited to a racemate, as suggested by Sanofi, would be to import a limitation into the claim from the specification, contrary to this court's recent holding in Fizer v. Ranbaxy just a few months ago. That's at 457 Fed Third at 1280. Now, isn't your theory of claim construction on Claim 2, which was in your claim construction memo, it's at A6302 in the record, do I understand you to say that you believe Claim 2 correctly interpreted reads literally on Claim 3 of the other patent? Pretty much literally, yes, because it includes enantiomers or their mixture. And Claim 3 is a mixture of enantiomers. It's the D enantiomer substantially separated from the L enantiomer, which is a mixture of enantiomers. What happens to your case if we don't agree with you on your theory of claim construction on Claim 2? Well, I think I have a little tougher road to hoe on double patenting, but I still think that looking at the specification as a whole and looking at the 596 patent as a whole in the disclosure. I'm a little confused. Is your Claim 2 argument part of your genus species case or not? No. I didn't think so. So what is your response to what I understood the district court's analysis of the genus species issue? Because I understood the district court. They said, well, we're going to look at Claim 1 of the earlier patent as a genus, and then we're going to look at Claim 3 of the patent as soon as the species, and the question is, do you want to anticipate the other? And on two grounds, they said no. They said no, first, because we don't believe that Claim 1 teaches the species, and secondly, in one of ordinary skill in the art, we'd have to engage in undue experimentation in order to enable Claim 1. So I didn't understand what your response to that argument was. Well, first of all, with regard to the – Are all your eggs in the Claim 2 basket? A lot of them are, yes, Your Honor. All of them? Claim 2 and Claim 1, yes. Well, let me ask you a question. Are all of your eggs in the Claim 2 basket? Yes, because the district judge did not look at Claim 2 at all. He focused solely on Claim 1, and the Chauvin case says you have to look at the whole specification of the 596 patent, everything that it teaches. Well, the district court looked at Example 1, didn't he? It did. And how far off is Example 1 from Claim 2? Well, Example 1 is a racemate. It's a hydrochloride salt. But to my question, how much daylight is there between Example 1 and Claim 2? Not much, is there? Well, Example 2 – I'm just now addressing your point that the district court judge ignored your argument. Yeah. Example 2 is broader than Derivative 1. Derivative 1 is included within Claim 2, but Claim 2 is not limited to Derivative 1. You said Example 2. You mean Claim 2. Claim 2. Now, let me ask you while we're on that. Let me make sure I understood your answer to Judge Cleveringer before, and one of us may have gotten it wrong. Were you saying that Claim 2 is not the source of your genus species argument? I'm not sure I understand your honest question. Well, in other words, when I use the term genus species, I'm thinking of the petering type argument. In other words, there's a genus, but it's a small genus with a small number of species, and therefore there is anticipation in that setting under certain circumstances. Does that argument derive from Claim 2? Yes, it does. Because I understood you to say to Judge Clevenger that it did not. But you're saying that it does. It does. Okay, I thought that. You see, Claim 2 to us presents a set of six permutations. You've got two enantiomers, and you've got three preferred salts. Okay, I understand that's your position, and that was your response to Judge Lurie's question. But suppose we should construe Claim 2 as limited only to the compound actually recited in Claim 2 and not to pick up the enantiomers and the salts. Now, where does that leave you with respect to the anticipation argument? Well, we still have an anticipation argument because you look at the specification as a whole, and you see that derivative 1 is a racemate. The person of ordinary skill in the art knows that you can have either an enantiomer, and the person of ordinary skill in the art knows that you can make a preferred salt with one of the strong acids that's illustrated in the specification, which are hydrochloric acid, hydrobromic acid, and sulfuric acid. So the argument is stronger if it's on Claim 2, but it doesn't go away altogether if you construe Claim 2 differently. And that is still, you think, an anticipation argument as opposed to becoming an obviousness argument? Well, we also argue obviousness as well. I know, but I'm trying to see if that's what you're left with if Claim 2, in effect, gets construed narrowly to be limited just to the recited compound. We certainly are contending obviousness as well. Well, I understand, but my question is, given the hypothetical that I've posed, are you then left high and dry with respect to anticipation? I don't think so. I think you look at the whole specification and the permutations that a person of ordinary skill in the art would make. Now, I see that my 10 minutes are up, and I'll have to come back for my five minutes of rebuttal after Mr. Chesler speaks. All right. Fine. We'll save it for you. Mr. Chesler. Yes, good morning. The invention here, which is described in Claim 3 of the 265 patent, as I'm sure the Court is aware, has four basic elements. The hydrogen sulfate salt of the dextrorotatory isomer of a particular chemical formula described in the claim substantially separated from the levo rotatory isomer. That's the invention. That invention is not described in the 596 patent. It is not anticipated. What Apotex does is to go through an after-the-fact hindsight argument and say, well, if we read into Claim 2, which is a free base with no reference to salts. Well, you're using the loaded words, read into. Of course, we're not supposed to read limitations into claims, but give Apotex argument. It's due in response to us. They're saying applying the Phillips test for claim construction, if you read Claim 2, you will end up with the construction they propose at A6302, which is you add the salt and the separation. Now, given Phillips, why is that wrong? If we are going to take the specification and massage it in our hands over and over again to try to figure out what the true scope of Claim 2 is, what's wrong with Apotex's theory? Well, among other things, Ryan, Claims 1 and 8 of the 596 patent specifically recite that they include enantiomers. Claims 2 through 7 do not. I would ask, what is the point of having two of those eight claims specifically refer to enantiomers and the other six not if, according to Apotex's application of the Phillips case, you read enantiomers into the other five, six claims anyway? Claim 2 is generic to the two enantiomers, isn't it? Your Honor, if the question is, do racemates have enantiomers, the answer to that question is yes. But that would prove too much, I submit. That would say whenever you have a prior disclosure of a racemate, it anticipates the enantiomers. Of course, the May case says exactly the opposite. It dominates enantiomers, probably. It may well. But the question is, does it sufficiently describe it for purposes of anticipation? And I say again, why would you have enantiomers recited in two of the claims of the very same patent, not reciting in Claims 2 through 7 if you are to interpret all eight of those claims as, in fact, describing enantiomers? And with respect to salts, there is no reference in Claim 2 to salts. And contrary to Apotex's position, there is no preference described for salts. If you look at the 21 examples in this case, in the 596 patent, you'll find that nine of the 21 are described as free-based compounds, not as salts. Five of them are described as hydrochloride salts. Four of them are described as bisulfate salts. One of them is a hydrobromide, one a sodium, and one an oxalate. And by the way, one of the five that is described as a hydrochloride salt is the racemate of which Plavix is the dextrorotatory enantiomer. Example 1, and I respectfully disagree with counsel, the judge specifically focused on this question and quite clearly went through an analysis in his opinion based upon the testimony of their expert, Dr. McClellan. He was asked about Example 1. The only difference between Example 1 and Claim 2 is that Example 1 is actually described as a salt, although a hydrochloride salt, not the bisulfate salt. Otherwise, it is the racemate, the formula that is described in Claim 2. And Dr. McClellan was asked on cross-examination at the preliminary injunction hearing, what does Claim Example 1 describe? And he said it describes a racemate. He didn't say it describes the enantiomer. And but for the hydrochloride salt that's in Example 1, it is otherwise the same as Claim 2. And I would submit where the standard is, did the district court abuse its discretion here for their own expert to testify under oath that, in fact, the very same description in the very same patent, the specification of the very same patent, describes a racemate, but to argue that the claim does not hold water. Is there anything? Let me focus your attention on the Adamson case. Yes. Which your opposing counsel invokes. Is there anything in the record here that would counter the, what I take to be the underlying rationale of Adamson, that a person of skill in the art will know from certain kinds of compounds that they are racemic and that they have stereoisomers? That was sort of taken as a given that the court in Adamson began with. Is there anything in the record here that would suggest that in this case, this particular compound, that is not something that a person of skill in the art would know? No, no. If I understand your Honor's question, let me restate it to be sure we're committed. The question your Honor's asked is, is there anything in this record that would suggest that a person skilled in the art would not know that a racemic compound has enantiomers? Well, or that this particular compound is racemic. That's really the question. That's what gets us into Adamson, at least initially. Initially. Because in Adamson the court said, look, this is the kind of compound as to which any competent chemist would understand, just from looking at it, that this is racemic, number one. And two, therefore would visualize the enantiomers. Yes. Now, is that true here? I believe it is. Okay. So whenever we have a disclosure of the compound, we also inevitably then have a disclosure of the enantiomers. Well, you know that there are enantiomers. Right, okay. Yes. Now, in this case, however, your Honor, the question is whether or not that fact alone constitutes a basis for anticipation of this patent. I would submit if that were true, then the In Re Me case, decided well after the Adamson case, could not have held what it held, which was that the disclosure of the racemate form of a compound does not anticipate a later patent on the enantiomer of that compound. And there have been a flurry of lower court cases, one of which was affirmed curiam by this court recently, the Arthur McNeil case, that have held to the same effect. Racemates do not anticipate the later enantiomers. And here we have the added fact, as I mentioned before, that we have a serious, I believe, substantial claim differentiation issue here, where we have one claim that does not include the enantiomer language, whereas other claims do, and one claim that does not include any reference to Sahls, whereas there is other information in the patent. Now, correct me if I'm wrong, but my recollection is May was the case involving the non-addictive, surprising non-addictive property? Yes. Of the analgesic? Yes. All right. Pain medicine. Right. Okay. Now, what is there, I mean, you say, well, May has essentially, I take it you're arguing essentially that May has trumped whatever the broad reading may be given to Adamson. But if you read May as limited to a case involving surprising results, what's the evidence here that this is more like May than it is like Adamson? You're on the question of obviousness, Your Honor, and surprising results? Yeah. Well, the 265 patent says on its face that there was an unexpected separation or decoupling of activity and toxicity. And, in fact, what happened here was when the enantiomer, when the racemate was split, and by the way, the record here shows that the company, Sanofi, spent seven years and millions of dollars pursuing the development of the racemate, in fact, had put the racemate into humans in clinical phase one trials before they even attempted to split the racemate into its enantiomers, which then took five months. And there were four different methods that were applied before those scientists were able successfully to resolve the enantiomers. When they did, and they tested the enantiomers, they found to their surprise that not only was one, the dextrorotatory enantiomer, the entirely active enantiomer, and the levorotatory had none of the activity, the anti-aggregating activity here, but it was the inactive enantiomer that had the toxicity, virtually all of the toxicity, and all of the neurotoxicity. Now, go back, for example, to Your Honor's reference to the Adamson case. What the Adamson case said, even before May, was that in that case, the racemate toxicity found itself in between the toxicity levels of the enantiomers, which that court said was not surprising in its view. Here, you have something dramatically different. The racemate toxicity is not in between the racemates, in between the enantiomers. The levorotatory enantiomer and the racemate, with respect, for example, to neurotoxicity, have all of the toxicity, and the dextrorotatory enantiomer has none of it. It was the decoupling of those two properties, activity and toxicity, which was surprising. And the record has, Your Honor, a very, very critical piece of evidence, which is virtually ignored by apothecs. It's a memorandum written by an internal scientist at Santa Fe and by the name of Pierre Simon. And what Pierre Simon says, and I'll give Your Honor's a cite to the place in the record. It's A6438-39. Mr. Simon was in charge of the development program for this drug. On April 16, 1987, after the separation of the enantiomers had finally been successfully done, and they tested them for activity and for toxicity, here's what he said. Only the D form was active. The L form was more toxic. The L form was specifically responsible for convulsions. We cannot envision development of the D plus L form, which is the racemate. Our efforts, therefore, are turning to the D form, and we are taking all possible steps to reduce our lost time. They lost four years of development lead time by stopping the development of the racemate and going with the dextrorotatory enantiomer. 6438? And 39. We didn't have that in our record, I don't believe. It is in the appendix, Your Honor. 6438 and 39 are cites to the appendix on appeal. I've got 6318 to 6589. This is 6438. Sometimes the pagination is not always sequential. I have another cite. I apologize, Your Honor. Counsel has just given me another cite to A2008, which is the French version, and there is an English translation as well. And as I say, the Simone memo, and as this court said, by the way, in the Donahue case, the real world facts of what the real scientists were doing or couldn't do in that context with respect to enablement is critical evidence of whether or not in that context something was enabled or not. Here, not only did it take them five months of effort to separate this racemate into its enantiomers, which is critical evidence that there's no enablement, one of the grounds that the district court relied upon in finding no anticipation, but it's also compelling evidence that this wasn't obvious. Why would any commercial enterprise straining to come to the market with a new drug that did not cause potentially fatal blood problems, which is what Teichlid, the prior anti-aggregation drug, did? Why would they spend seven years and millions of dollars pursuing a racemate if it was obvious that the answer was the dextrorotatory enantiomer in a particular source? All of this is in the context of a preliminary injunction where substantial deference is given to the trial court. No one has yet talked about the preliminary injunction factors, and I want to ask you about irreparable harm. Yes, sir. The court did find that all of the factors tipped in favor of synophagy. Regarding irreparable harm, usually irreparable harm on a preliminary injunction is dealt with in the context of before marketing. Marketing has already occurred here. In a sense, the harm has occurred. Why is it so clear that irreparable harm, going forward, favors synophagy if all that stuff is out there, in a sense, the roof has fallen in? Yes, Your Honor. There are a number of reasons. First of all, the record shows from Apotex's own mouth that they had many, many more orders yet unfilled on the day the preliminary injunction was entered. That's at A1480 from the president of the company. Had there not been a preliminary injunction, there would have been more sales of this drug than the six months' worth that they flooded the market with in 24 days. Second, the evidence showed from Professor... What's the status of the supply that was shipped that has yet to be sold? Does the preliminary injunction bar a pharmacist from filling a prescription with Apotex's product? No, Your Honor. In fact, my clients are, to this day, suffering very severe... Let's get it clear. So the so-called six-month supply that was shipped can be sold? Oh, yes. And it's out there. And the overhang, as our witness, Professor... So to the extent that it's lower-priced than your client's product, then that lower-priced pharmaceutical, at least the six-month supply of it will be sold off? Yes, absolutely. And the preliminary injunction enjoins any further shipment by Apotex of the product into the marketplace? Correct, Your Honor. And what the record showed, and what Professor Hausman testified to, was the longer that the injunction was not enforced, the more they were able to sell it ahead of an injunction, the deeper the permanent effects of price erosion in the marketplace would be. So the idea that all of the harm was behind us is absolutely untrue here. But wait. How can there... Assume, for purposes of argument, that your side prevails after trial. Where's the price erosion? During the period of time that the six-month supply is allowed to be sold, it's a no-brainer that that stuff's going to be sold at a lower price, perhaps, than your client is selling its good, right? Yes. And so, as I say, if you prevail, you'll be in the market and nobody will be there competing, right? No, but, Your Honor, here's where the problem is. Is there evidence that your client will be unable to bring its product back up to the pre-injunction price? Absolutely. And that was Professor Hausman's testimony. His testimony, which was relied upon by the court, credited by the court, was that the long-term price erosion would persist because our clients will then have to negotiate with third-party payers to have more favorable tier placement restored in order to make their drug less expensive to consumers. Those third-party payers have enormous leverage in the marketplace. And in order to get them to agree to that, you have to give price concessions to get restoration back to more favorable tier placements. And there is no way to calculate in advance. Indeed, just the other day, interestingly, Apotex is trying to put into the record that the CFO of the company pointed out that virtually nobody took the incentives we tried. They were so ineffective, they're going to have to negotiate even further to get restoration of any of the price. How about the argument that you've already put a price on whatever the burdens of Apotex's actions are via your agreement to the 50% price stipulation? Yes, and I'm glad you raised that, Your Honor, because as the district court found, all that was was a negotiated liquidated damages provision explicitly until an injunction is entered, until enjoined. It is no different. Suppose we had agreed that until an injunction was entered, the cap would be 100% of our losses. It would still be a finite number. Well, I guess I'm really asking a question that goes to a more basic inquiry of where we are after eBay on looking at factors such as irreparable harm. I mean, you could say, well, there's your demonstration, proof, plain and simple, that you have the capacity to quantify your losses in dollars, and therefore, you have an adequate remedy at law, therefore, why should you get an injunction? Now, I understand that that's a pretty broad, sweeping argument. The implications are, but, which I suspect you were about to say, but given that that's true, why isn't that the implication, the necessary implication, of the court's opinion in eBay? Right. I know I'm past my time, but let me answer very quickly. Please finish. Answer number one. That would be true of any negotiated liquidated damage provision. No matter what number you fill in for the 50%. It cannot be that because you've agreed on what your damage is in the short run until an injunction is entered, you've conceded... That's the implication, broad implications point. But, by virtue of reading, a simple reading of what eBay said about the equitable factors, and arguably saying that the presumption of irreparable harm is no longer operational, where does that leave us? Where do we draw the line? Yes, that's where I'd like to go with my other two points. Second, eBay, although I urge this court that it is not necessary for you to decide that sweeping question in this case. It's an important question, although here it's not, I believe, necessary to decide because, among other reasons, the district court went on to find at least three other bases of irreparable injury here, including the potential for layoffs, including the potential for cutting back on clinical studies. If we were facing... If they were able to dump six months' worth of this drug in the market in 24 days, by the time this case goes to trial and is resolved with a January 22nd trial date in the absence of an injunction, they would be able to dump the entire shelf life of this drug into the market, two years' worth. And under those circumstances, under those circumstances, it's perfectly clear what the injury would be. It would be enormous injury, and we would not be supporting multi-multi-million dollar clinical trials for a drug on which our exclusivity has been lost for the next two years. Last point, Your Honor, the eBay opinion says ten times, I went back last night and I counted it, ten times it relates to a permanent injunction situation. The policy considerations in a preliminary injunction situation which require the maintenance of status quo in pending and imminent trial are dramatically different from the policy considerations when there's been a final determination that you have won, and you're not trying to maintain a short-term status quo, you're trying to maintain a long-term intellectual property right. You have very different criteria under those circumstances, and I would urge the Court that if one is going to venture into the horny and prickly area of trying to resolve a permanent injunction decision in the context of a preliminary injunction case, I respectfully submit we need some more guidance from the Supreme Court on that question, because this is not that case. Well, I think we kind of get that, and we thank you, Mr. Chesler. Mr. Chasen has some time. In fact, we'll give you another four and a half minutes if you need it. Thank you, Your Honor. First thing I would like to address in line with Judge Bryce's question, the Addison case. The Addison case is on all fours with this case. In the Addison case, the levo isomer had this spasmodic activity, which was the beneficial activity, and it was also less toxic in the acute toxicity study. It was held in Addison that the claimed invention was obvious, and we have the exact same situation in this case. Well, I wonder. Not quite, it seems to me. I mean, even if you assume that the same situation obtains with respect to the stereoisomers, Addison, as I read the opinion, covered the salt issue by saying that the parties had not disputed that the salts did not contribute patentability. In this case, there is a dispute on that. So it seems to me that at least in that regard, this case is different from Addison. Well, I don't disagree with your analysis on that, Your Honor. The salt issue is a question, and we believe that the 596 patent teaches a person of ordinary skill to use the strong acids to make acid addition salts, to use the hydrochloric acid, the hydrobromic acid, the sulfuric acid. All of those are suggested by the 596 patent, and you don't have to have 100% predictability in making the salt. All you have to have is a reasonable expectation of success, and you take these weak bases, which are the thionylpuridines, you treat them with these strong acids, you can make a salt. A person of ordinary skill in the art has an expectation of being able to make a salt. Now, there is nothing in the 596 patent that indicates that any one of the salts, the hydrochlorides, the hydrobromides, or the bisulfates, which are the salts for the esters, there's nothing that indicates that any one of those salts is unsuitable. And based on the closest prior art, a person of ordinary skill in the art would think that a bisulfate salt, a clovergle, is going to work. It's suggested by the 596. Now, but I want to get back to another point about Adamson. The key evidence in the 265 patent is that clovergle has the anti-aggregating activity, it's the DNA tumor, and the LNA tumor is more toxic in the acute toxicity study. It's the same exact fact pattern as in Adamson. So these kind of toxicity splits are not unexpected to a person of ordinary skill in the art. Now, Mr. Chesler spoke about convulsions evidence. There is no report in the 265 patent of any convulsions. There is an acute toxicity study. It says that certain rats have died at certain doses. There's no report of convulsions. In the prior art 596 patent, no report of convulsions. In the San Diego and Jerusalem posters that were put out in the international conferences where PCR 4099 was tested in human clinical trials and found to have excellent tolerance, there is no report of convulsions. The prior art does not talk about convulsions. The 265 patent does not talk about convulsions. A person of ordinary skill in the art evaluates obviousness based on what is in the prior art. Now, what Mr. Chesler is doing, he's going into the private research of Sanofi and saying, okay, they found convulsions when they did the acute toxicity study with the LNA tumor, but they didn't put it in the patent. And we have a motion eliminated that goes directly to this point. It's motion number 9, and that is based on the fact that, well, it's based on Graham v. Deere, Vamco, and Inring-Davies. And those cases hold that the basis for overcoming obviousness has to be put forth in the specification. Since there's nothing in the 265 patent on convulsions and nothing in the prior art on it, this evidence should not be admitted. It shouldn't serve as a basis for supporting unobviousness. And the trial judge, Stein, did not rule on that motion or any other motion, but we think it's a very sound motion. Let me see. I want to address the irreparable harm. All those motions will be decided if the case is returned for trial? I would hope so, Your Honor. We had several motions. There was one on the bisulfate salt as well. They argued that the bisulfate salt had surprising properties. Well, what they based it on was the clopidogrel hydrochloride. Clopidogrel hydrochloride is not in the prior art either. It's claim two of the 265 patent, and it turns out that clopidogrel hydrochloride is an unstable salt. It's hygroscopic, and it degrades. But as we said before, there's a standard of review here, views of discretion. Yes. You've got an uphill battle. There was all sorts of presentation of evidence and pretty thorough district court opinion went through all these issues. Well, we think he missed the boat on a lot of the issues, Your Honor, and we've tried to point that out in our brief. I do want to turn to irreparable harm a little bit, and there's a settlement that the parties entered into here, and that contract altered the status quo. Sanofi and Bristol Myers created new conditions in that agreement in the settlement with the architects that dramatically altered the market. Let me cut to where I think you're going, and if I'm not right about this, you can go back and pick it up. Essentially what you're saying, I think, in a word, is that they put a price on what they would lose absent an injunction, and having done that, they're not entitled to an injunction. Isn't that essentially your point? That's essentially it. I'd like to expand on that just a little bit. They expected that if there was no regulatory approval by the FTC, they expected that Apotex would enter the market, would flood the market. It was entirely foreseeable. Okay, and so they said, okay, we think 50% of total sales would compensate for us. Once they say that, then they can't come in and say irreparable harm. Exactly. Now, why isn't that argument broad enough to apply, for example, to suppose I'm the patentee, and I say, okay, I make a licensing offer to you, and you say, no, I'm not interested, and then I sue you. Have I foreclosed myself from ever getting an injunction by virtue of the fact that I made an offer which demonstrates what I think my patent is worth? I'm willing to have by way of compensation. Now, hypothetically, Your Honor, are you saying was the offer agreed to? No. But I have already committed myself to saying, if you pay me this much money, I'm happy and I'll go away. Is your position so broad that it would say, in that situation, you've already demonstrated that there's an adequate remedy at law by virtue of telling me what the number is? Well, I would say that our position is based on the fact that we have a contract, not just an offer that was rejected. We have a contract that fixes the damages. From the perspective of the harm that the patentee thinks they're going to suffer, what's the difference of whether it's been accepted or not? I mean, if I put, as Judge Bryce is saying, I put on the table and I say, well, here it is. It's 20 cents a pill. That's what I'll license it to you for. That's the degree of harm if you're going to be infringing my patent. Why does it make any difference? I'm trying to decide whether or not there's a greater degree of harm. Well, I think it makes all the difference in the world because, in fact, there is a contract and courts all the time enforce contracts. So they agreed to a cap on damages. They agreed no treble damages. And when they agreed to a cap on damages... Yeah, but your consent to their estimation of their degree of harm can't make larger or smaller their extent of harm. They've said it by themselves. Well, when they agreed to the 50% cap on damages, I think that that excluded issues like lost profits and price emotions. The parties agreed to a mathematical determination of what the damages were going to be. And it's... Well, even if you have some merit to your argument here, isn't it true that the trial judge found irreparable harm on other factors that are broader than simply the immediate economic impact on Sanofi? Well... Like real human beings lose jobs, right? He said that without much of a record to support it. Well, it's there. Yeah, he did say that. But when you think of that, Your Honor, here you have a major drug, Plavix. It's the number two selling drug in the world. And it doesn't make sense they're going to lay off their sales force if they think they're going to win the case on the nurse in six months. It makes no business sense at all. Same thing for clinical trials that they have underway. In fact, they've said they're not going to interrupt any clinical trials that they have underway. And they admitted that there was no price erosion, that it hadn't happened. Is that in the record? It's in the motion that was filed yesterday. Was that in front of the district court? No, it was not. Then why are you making reference to it here? Isn't that sort of against the rules? We're reviewing a judgment made by a U.S. district court judge to enter a preliminary injunction. Extreme relief, right? I shouldn't be listening to what's in the Wall Street Journal about whether this is good or bad, right? If I was still in front of Judge Chastain, I wouldn't    in the  Journal  whether   bad,  I'm not listening to what's in the Wall Street Journal about whether this is good or bad, right? I'm not              I can't enjoy this if I can't enjoy it. I can't enjoy it. I can't enjoy it.